## Richard S. Hallett and Walter Bowne, against Ebenezer Jenks and others.

IN error, on the judgment of the Supreme Court in Ebenezer Jenks and others, against Richard S. Hallett and Walter Bowne, reported in 1 Caine's New-York Reports, 60. The case was exactly as it is stated there, and the arguments of counsel only a repetition of the points before insisted on in the court below.

Lansing, Chancellor. On this case three questions have arisen: 1. Whether the sloop Nancy violated her neutrality by receiving the paper described in the case as a pass-port, found on board at the time of her capture? 2. Whether the voyage was illegal, and in contravention of the laws of the United States? 3. Whether the concealment of material circumstances would avoid the policy? As to the first point, the reasons given for the judgment of the supreme court appear to me satisfactory. There is nothing beyond the mere import of the paper which can aid in giving a construction to it. In its form it professes to contain simply a request to the officers of the French navy and privateers, to let the vessel *pass free;* and whether it is in the ordinary, or an uncommon form, does not appear. If it was the ordinary clearance used in the island of Hispaniola, it could not be considered as a violation of neutrality to carry it in the vessel; and as it is expressly found by the verdict that the passport was received on board at the Cape, no inference to the prejudice of the insured can be drawn from its being antedated, which

A vessel driven by distress into a French port, where a part of her cargo is taken by the officers of the government, and she prevented from taking away her original lading, may, without incurring the penalties of the acts forbidding all intercourse with the dependencies of France, purchase and load with the produce of the country. A passport granted by any particular government, to protect against its own cruisers, is not a sailing under the protection of the flag of that government, so as to stamp a national character on the vessel.

ALBANY,
1804.

R. S. Hallett
& W. Bowne,
v.
Eben. Jenks
and others.

might be the effect of positive regulation; and, as it has not been found by the verdict, that it was intended to confer some uncommon privilege on the vessel, I think, under all circumstances, it must be considered as a mere clearance. As to the second question, the *voyage, in its commencement, was* a lawful one. It was from one of the ports of the United States to the Havanna, a Spanish port; and the verdict finds that the vessel was compelled, *by distress*, to put into Cape François, in the island of Hispaniola. To the time of her arrival at the latter port, nothing had been done to forfeit her neutrality; the touching at it was the effect of inevitable necessity; the unlading the cargo was in compliance with a similar necessity, *for the vessel required to be repaired.* The disposition of *the cargo* was not a voluntary act; and its conversion into the productions of that island, was so far an act of necessity as to leave only the alternative of abandoning the interest, or giving it the modification dictated by the government. The policy was made to insure the cargo, thus acquired at Hispaniola, against *all risks.* The intent of the law of the United States, seems to have been, to restrain their citizens from aiding in the French carrying trade, and by that means to impress the necessity of respecting our neutral rights. All the restraints imposed by the statute are upon the vessel. The vessel is inhibited from being employed in the *traffic or commerce* described in it. The finding of the jury has completely severed the vessel and its cargo; for it is found by the verdict, that, upon the arrival of the vessel at the Cape, the cargo *was landed, and was not permitted to be re-laden.* The unlading was the effect of necessity, and though the captain disposed of the *cargo*, neither its disposition nor the new investment could be considered as the employment of the vessel; and yet the *employment of the vessel* was the only point to which the forfeiture could attach. The landing was involuntary, the re-lading impracticable; and though the vessel was afterwards resorted to as the vehicle of conveyance, it was to carry the property of citizens of the United States, acquired under circumstances of coercion, and it may literally and truly be said, in the language of the statute, not to have been employed in any traffic or commerce *with or for any person* resident within the French territory. The statute was limited in its operation to vessels departing from the United States

after the 1st day of July, 1798. After directing that such vessels should not be permitted to proceed to any port or place of the French republic, and *should not be employed in any traffic or commerce with or for any person* resident within or under the jurisdiction of the French republic, it adds, " and if any ship or vessel, in any voyage thereafter commencing, and before her return within the United States, shall be voluntarily carried, or suffered to proceed to any French port or place aforesaid, *or shall be employed* as aforesaid, contrary to the intent of the said act, that then the vessel and cargo shall be forfeited." The law was not intended to embarrass the citizens of the United States fairly pursuing the active speculations of trade. It never could have been the intent to devote to indiscriminate destruction, as well the property of those whose misfortunes subjected them to an irresistible necessity or force, as those who had voluntarily evaded its provisions ; and though a variety of cases may occur in which private rights must unresistingly bend to the safety and preservation of the commonwealth, they are to be found only in the extent, as applied to great and imminent emergencies ; and even in the case of treason, the authorities cited to establish the doctrine, show, that there may be exceptions to the universality of the rule. Here every fact, calculated to show that the conduct of the master was the effect of an influence he could not resist, is established by the verdict. This brings it within the purview of the first section of the statute, and appears to be contradistinguished from *voluntary* acts ; for the word *voluntary* may well be considered as the adjunct to the whole sentence, and not necessarily, in sound construction, to be exclusively limited to the words *carried or suffered* to proceed to any French port or place as aforesaid ; and I think numerous cases must occur, in which a vessel may, with as much propriety, be said to have been *involuntarily* employed in trade, as to have been involuntarily carried into port. The law of Congress, of 9th February, 1799, is sufficiently broad to embrace this case : it provides that if it shall appear, that any ship or vessel, *seized* for the contravention of that or the former statute, was captured or driven *by distress of weather*, or was *unavoidably detained or delayed*, by some embargo, &c. or *other unavoidable casualty*, without any *fault, wilful negligence*, or *intention to evade* the provisions of the said statutes,

*Margin notes:*

ALBANY, 1804.

R. S. Hallett & W. Bowne, v. Eben. Jenks and others.

Bac. 57.

4 Laws U. S. 129, sect. 1.

4 Laws U. S. 248, sect. 6.

ALBANY,
1804.

R. S. Hallett
& W. Bowne,
v.
Eben. Jenks
and others.

the secretary of the treasury may direct a restoration of the *vessel and cargo.* If it could be brought within the provision of the last statute, the decision of the secretary might, even *after a seizure,* have constituted this a legal voyage. The case of *Richardson* seems to have some analogy to this; but we are totally unacquainted with the reasons which influenced the court in that case, and I think too imperfectly acquainted with its merits, to consider it as having any weight here. The concealment of material circumstances is the last point. The cargo of the vessel was insured on a voyage from Hispaniola to St. Thomas. As the insurance was made after the passing of the second act, and from it, circumstances might exist to constitute the voyage from Hispaniola a legal one; with a full knowledge of this circumstance, the insurers underwrite against *all risks.* But it has been said, that the time of the departure of the Nancy from the United States does not appear to have been disclosed to the insurers; and hence it is inferred, that there was a concealment of a material circumstance. The allegation of *concealment* is in the nature of an *avoidance,* and must either be pleaded or averred, and in all events must be proved, or it cannot, in legal operation, avoid a contract, in other respects valid. It is alleging the existence of a fraud, and is of itself a substantive and effective defence, capable of destroying the contract. Nothing of this kind appears in the record; and in pronouncing an opinion in this case, the court are necessarily confined to the record. For these reasons, I am of opinion the judgment in this case ought to be affirmed.

L'Hommedieu, senator. Two months had elapsed after the vessel's sailing, before the insurance was made. It was then effected at a premium of 25 per cent. This is evidence of extraordinary risk; and it is more probable that the insurers knew of her situation, than that the insured made any concealment. We cannot suppose the insurers would have asked so high a premium, if they had not known her situation, in what port she lay, and the possibility of her sailing with such papers. But these cannot be said to enhance the price of insurance, as they would be rather in favour of her safety than against it. The captain did not go to a French port *voluntarily.* After he was there, and could not bring away his property, it was more to the interest of the United States, that he should bring some equivalent, than to leave

the whole, never to be recovered. On this ground, among the others already stated by the court, the conduct of the assured ought not to be considered against the intent and meaning of the laws of the United States. I shall only observe, that it is probable, that the vessel could not have escaped, or come from a French port, without the clearance or certificate found in her, but at the risk, perhaps certainty, of being taken by the French cruisers, who knew her situation. On the whole, I am of opinion, that the judgment of the supreme court ought to be affirmed.

*⁎* The whole court concurring, the judgment of the supreme court was unanimously affirmed.